## SCOTT BURR STORES CORP v SPECTER et

Common Pleas Court, Hamilton Co

Decided March 14, 1939

LeBlond, Morrissey, Terry & Gilday, of Cincinnati, and Stanley & Smoyer, Cleveland, for plaintiff.

J. W. Brown, Cincinnati, and Arthur C. Fricke, Cincinnati, for defendants.

### OPINION

By SCHNEIDER, J.

Plaintiff is a corporation organized under the laws of the state of Illinois and operates one hundred and thirty-six stores throughout the United States.

On the 9th day of September, 1938, plaintiff opened a new store in the city of Cincinnati, located at No. 1228-32 Main street. This store occupies approximately fifty feet frontage on a public sidewalk which sidewalk is approximately thirteen feet wide from the building line to street curb. The store operates a retail business in assorted small merchandise articles which retail from five cents to a dollar or two dollars. As a separate department, this store also operates a counter restaurant service or luncheonette soda fountain.

The defendants are officers and representatives of two separate voluntary unincorporated associations or labor unions —one, the Retail Store Employees Union, Local No. 1099, of the Retail Clerk's International Protective Association, and the other, Local Union No. 363 of the Miscellaneous Hotel and Restaurant Employees International Alliance, both affiliated with the American Federation of Labor.

The prayer of the petition is that a permanent restraining order issue against defendants enjoining each of them, and all persons acting in conjunction with them:

"1. From picketing, bannering, or patrolling the street or sidewalks adjacent to or in the vicinity of the plaintiff's place of business and from loitering or congregating and from interfering with the ingress and egress of plaintiff's employees or its customers at or near any entrance thereof, and from threatening to do so.

"2. From inducing or attempting to induce any customer or prospective customer not to deal with the plaintiff and from making, publishing, distributing or displaying any statement, oral, written, painted, printed, or otherwise, and from doing any other act or thing, with the intent, purpose or effect of injuring the business of the plaintiff and from threatening to do so.

"3. From inducing, persuading or coercing or attempting to induce, persuade, or coerce, a breach by plaintiff or any of its employees of any of the employment contracts between the plaintiff and the plaintiff's employees.

"4. From damaging or attempting to damage any of the plaintiff's property and from threatening to do so.

"5. From advising, protecting, aiding, abetting, or assisting any person or persons in the commission of any of the acts hereby restrained."

This court denied a temporary restraining order and the case came on for hearing upon the issues joined by answers filed to said petition by defendants herein, and the evidence.

The facts are substantially as follows:

About the middle of August, 1938, before the opening of the store, a representative from each of the defendant unions approached the manager of the store who was preparing for the opening and stated that they desired the plaintiff company to employ members of their respective unions, and thereafter several conferences took place between the manager and the representatives of the defendants with respect to the manner of employing union help and of entering into contracts with the unions for a closed shop. These conferences continued for a while after the opening of the store. The testimony indicates defendants stated that unless satisfactory arrange-

ments were made with the defendant unions for the employing of union help, "pickets" would be put out in front of the store. At this time the testimony shows that the union representatives were told by the manager and other executives that the plaintiff company was interested only in employing the best available people, that it was not concerned as to whether their employees were or were not members of any unions, but that they would not require any of their employees to join a union if they did not care to do so, and that they would not enter into any agreement with the defendants for a closed shop.

Prior to the opening of the store, on September 9th, most of the employees had already been employed, one or two were transferred from stores in other states; a few persons were employed who walked into the store and made application and other employees were procured through the Ohio Employment Bureau, which is a public employment agency. The evidence shows that it is the customary practice and experience of the plaintiff at the time of the opening of a new store, such as the Cincinnati store, to hire a large number of temporary workers, running possibly five times the number required regularly as a permanent force and these extras continue for a week or ten days after the opening. In addition to the regular full time help it is customary for this store to employ additional girls for part time work in the afternoons and on Saturdays.

All the employees of the plaintiff company were, at the time the acts which are the subject of the controvery took place, and are now, under written term contracts of employment renewable from time to time for definite periods.

As stated, the store opened and began business on Friday, September 9, 1938, and from then until Saturday, September 24th, the various conferences referred to between the agents of plaintiff company and the defendants took place.

On Saturday, September 24th, the defendants employed four girls and caused them to walk to and fro on the public sidewalk in front of plaintiff's place of business bearing signs in the form of an apron which each girl wore over and across her front and back. After a few days the number of these girls was reduced to two. The sign borne by one of the girls reads:

"Scotts—Unfair—Do not employ Union Fountain Help. Local Union No. 363 affiliated with A. F. of L."

The sign borne by the second girl reads:

"Scotts—Do not employ Union Clerks Retail Clerks Int'l. Union—affiliated with A. F. of L."

These two girls continued carrying the apron signs day after day up to and including the time of the hearing of this cause.

There is some testimony to the effect that on one occasion a stench bomb was placed in the store and that signs were torn off windows of the store, but there is nothing to connect the defendants or the girls carrying the banners with such acts.

The girls carrying the banners were instructed by the defendants that they should do nothing except walk to and fro near the curb and to talk to no one. The testimony, in the opinion of the court, bears out the contention of the defendants that these instructions have been reasonably adhered to by the girls wearing the banners. There is nothing in the evidence to show that the patrolling of these girls upon the sidewalk in any way interferes with the ingress and egress of employees or customers of plaintiff and in no way can it be said to constitute a nuisance to the general public. The testimony is without dispute that the defendants and their agents have at no time approached any of the employees of the plaintiff company in any way and have definitely never sought to induce any of them either to join a union or to leave their employment. The testimony of plaintiff's employees is that they do not want to join any union and some of them stated that they would not join a union under any circumstances. All of them apparently are satisfied with their positions and the conditions under which they work.

So far as the evidence discloses there has been no communication between any of the defendants and the executives or employees of the plaintiff company since the time of the filing of this action.

At the time of the opening of the store the plaintiffs employed some ninety persons in all. Two weeks later this number was reduced to twenty-five or thirty employees in all. On Friday, the day of the opening, the gross sales of the plaintiff amounted to $2,133.61. The next day, Saturday, they totaled $1,587.05. The gross sales of the following Saturday amounted to $1,111.17. On the third Saturday, the day patrolling began, two weeks after the opening, the

gross figure is $525.89. There was a decline in the week day gross sales of the second week from those of the first week of business, and a further decline the third week of business which followed the beginning of the bannering. In December the sales gradually increased and on Saturday, December 24th, the gross sales amounted to practically the same as of the day of the opening.

The testimony does show that defendants are engaged in a boycott of plaintiff's business accomplished by means of correspondence with other affiliated and friendly unions and by advertisements and other articles contained in a labor union newspaper, all of which are in evidence. There is no evidence of a so-called secondary boycott or any attempt thereat.

The plaintiff contends that the acts of defendants as described above constitute an unlawful boycott and an unlawful picketing, in that there is no legitimate trade dispute existing between the parties.

Defendants claim that they are entirely within their rights.

Many cases in Ohio and throughout the country have been thoroughly and ably briefed by distinguished counsel representing both sides in this controversy. All but very few cases presented as authority arose out of actual strikes resulting from bona fide labor disputes between employer and employees and, in the opinion of the court, as hereinafter expressed, are not in point.

The case before this court is not a strike case although labor unions are involved.

It can not be said that any legitimate trade dispute exists unless such dispute arises out of an employer and employee relationship. In the present instance there is no dispute nor has there ever been between the plaintiff employer and any of its employees.

Lawful picketing, in the opinion of this court, is a method used by employees or labor representatives by peaceful means to persuade the employees of an employer either to join with others in a union or to strike and refrain from working pending the settlement of existing lawful grievances arising out of the employer-employee relationship.

"Picketing", as so defined, is not involved here.

As above stated, the defendants are engaged in a boycott, but one not unlawful in itself, and the sole question presented under the evidence is whether or not the bannering by the two girls as hereinabove described constitutes such an unlawful invasion by defendants of the rights of plaintiff as to justify the interference of a court of equity.

Herein are involved, generally, the rights of three distinct groups of individuals.

The plaintiff company has the right to engage in its business enterprise without unlawful interference on the part of anyone. It has the right and is free to contract with any and all persons as employees without unlawful interference by anyone. It has the right to conduct its business as it sees fit within legal bounds without hindrance.

The present various employees of the plaintiff company have the right to engage in their employment without any interference on the part of these defendants or anyone else and their right to accept employment of the plaintiff company and to engage in said employment is to be respected and protected.

The defendants have the right to freely speak the truth limited only by the laws respecting slander and libel, and so have the right to publish the fact that plaintiff does not employ members of their respective unions.

The rights of none of these groups may be so used as to constitute an unreasonable interference with the rights of the others.

With the exception of the use of the wording "unfair" in the printed matter used by one of the girls carrying the banners, the wording used on the banners constitutes statements of fact which are beyond dispute. If we assume the right in the defendants to publish the facts, this court can not say that the manner in which the publication is made can, in itself, constitute that publication unlawful. If we assume in the defendants the right to publish these facts in a newspaper, or on billboards, or on banners paraded up and down the highways, other than in front of plaintiff's place of business, can it be contended that the publication by the defendants through the use of apron banners in front of plaintiff's place of business in itself constitutes it unlawful?

We are, therefore confronted here solely with the question: "Is the bannering in front of the store an unreasonable interference with the business of plaintiff?"

The evidence shows plaintiff continues to do business. The gross sales continued steady over a period between the day of the opening and the end of the year. It is true that the figures show a falling off at the time the bannering began but it is reasonable to assume that this was a natural reaction after the first two weeks following

the opening, and one well within the expectations of the plaintiff company as indicated by their practice of engaging four or five times as many employees for the first couple of weeks after the opening as the regular demands of the business would thereafter require.

It is also reasonable to suppose, that while some persons, knowing the facts, would refrain from becoming customers of a store not employing members of a union, other persons would for that same reason be disposed to do business with plaintiff company.

This court can not find that the bannering interferes with the business of plaintiff other than as might reasonably be expected from any lawful exercise of the rights of other persons.

For instance, the evidence in this case shows that when plaintiff company opened its store at the stated locality it became a competitor of two other companies theretofore engaged for some time in the same line of business, one almost immediately adjoining and one opposite store of plaintiff. If it were assumed that the opening of plaintiff's store reduced the business of these competing firms, would a court of equity restrain plaintiff from operating its business in the exercise of its right to so operate merely because the exercise of that right interfered in some measure with the business of the other two established concerns? We think not. Such a situation it seems to this court is no different than is the exercise by the defendants herein of their right to freely publish the facts as they exist, even if, in the exercise of that right the plaintiff does suffer some attendant loss of customers or patronage.

The court has in mind and has considered fully the decision of the Court of Appeals for the First Appellate District of Ohio in the unreported case of **Hamilton Tailoring Company v Cincinnati Joint Board of Amalgamated Clothing Workers of America, et al**, being case No. 5054. That court restrained pickets from peacefully engaging in any efforts to persuade or induce the employees of the Hamilton Tailoring Company to strike or leave their employment.

The present case is clearly distinguishable. Here we have no strike, no labor dispute and no attempt on the part of defendants to interfere in any way with the present employees of the plaintiff company.

If the evidence in this case justified it this court would restrain defendants from using any violence, intimidation or coercion of any kind with respect to prospective customers or employees of the plaintiff company, and would, under proper facts, restrain any act on the part of the defendants directed toward influencing the employees of the company in any way to breach their contracts of employment and from any act which could be construed as coercing any prospective customers from entering plaintiff's place of business.

The court will restrain the use of the word "unfair" in connection with any placard or printed matter in use by either of the banner carriers.

Further than this, the court finds, on the issues joined, in favor of the defendants and a decree may be drawn accordingly.